**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **JAMES D. CARPENTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:04 CV 53 DJS (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying James D. Carpenter's applications for a Period of Disability and Disability Insurance

Benefits under Title II of the Social Security Act. The cause was referred to the undersigned

United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636

(b). Plaintiff has filed a Brief in Support of Complaint (Document Number 10). Defendant has

filed a Brief in Support of the Answer. (Doc. No. 13). Plaintiff has also filed a Reply. (Doc. No.

14).

**Procedural History**

On April 4, 2002, plaintiff filed his applications for a Period of Disability and Disability

Insurance Benefits, claiming that he became unable to work due to his disabling condition on

February 8, 2002. (Tr. 92-94). This claim was denied initially, and following an administrative

hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ),

dated September 10, 2003. (Tr. 74-77, 20-29). Plaintiff then filed a request for review of the

ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was

denied on September 8, 2003. (Tr. 6, 3-5). Thus, the decision of the ALJ stands as the final

decision of the Commissioner. <u>See</u> 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on August 19, 2003. (Tr. 30). Plaintiff was

present and was represented by counsel. (Tr. 32). The ALJ began by admitting a number of

exhibits into evidence. (<u>Id.</u>). Plaintiff's attorney then examined plaintiff, who testified that he was

54, had completed twelfth grade and had not received any additional schooling or training. (Tr.

33-34). Plaintiff stated that he was not currently employed and that his last job was at Bluff

Honda. (Tr. 34). Plaintiff testified that he stopped working for Bluff Honda on February 8, 2002,

due to an eye injury. (<u>Id.</u>). Plaintiff stated that he is unable to return to work due to eye

problems, including loss of depth perception and loss of peripheral[1] vision. (<u>Id.</u>). Plaintiff

testified that he also suffers from diabetes and back pain. (<u>Id.</u>). Plaintiff stated that his diabetes

has worsened since the eye injury. (<u>Id.</u>).

Plaintiff testified that he is currently being treated for the eye injury, and that his doctors

are trying to correct problems with an eye prosthesis that he wears at all times. (Tr. 35). Plaintiff

testified that he has no vision at all in his injured right eye. (Tr. 36). Plaintiff stated that he

experiences periodic visual impairment in his left eye depending on the weather, although the

visual acuity in this eye was found to be 20/20, and he does not wear a corrective lens with this

---

[1]"Indirect." <u>Stedman's Medical Dictionary</u>, 1974 (27th Ed. 2000).

eye.  (Id.).  Plaintiff testified that the loss of vision in his right eye has affected his ability to read.

(Id.).  Plaintiff stated that he is only able to read for about five to fifteen minutes before he begins

experiencing headaches.  (Tr. 36-37).  Plaintiff testified that the loss of vision has also affected his

ability to engage in activities like threading a fishhook, due to his loss of depth perception.  (Tr.

37).  Plaintiff stated that the loss of depth perception also impairs his ability to drive, and that it

has caused him to hit vehicles with his front bumper.  (Tr. 37-38).  Plaintiff further testified that

his loss of depth perception has affected his ability to walk, especially on uneven terrain.  (Tr. 38).

Plaintiff testified that his blood sugar levels have been erratic since his eye injury.  (Id.).

Plaintiff explained that he experiences fatigue and dizziness when his blood sugars are low, and he

experiences ringing in his ears and pressure in his head when his sugars are high.  (Tr. 39).

Plaintiff stated that he notices a fluctuation in his blood sugar levels approximately five to seven

times a day.  (Id.).  Plaintiff testified that when he experiences a large drop in his blood sugar

levels in a short period of time he has to sit down and eat.  (Tr. 40).  Plaintiff stated that when he

has a large increase in his blood sugar levels he experiences headaches and must rest.  (Id.).

Plaintiff testified that he experienced back problems prior to his eye injury.  (Id.).   Plaintiff

stated that he can lift 80 to 100 pounds without injuring himself if he does it properly, yet he has

injured himself lifting much lighter objects when he lifted the object improperly.  (Tr. 41).

Plaintiff described his back pain as "a toothache in your back," and "a nagging, even pain," that

intensifies when he bends forward.  (Id.).  Plaintiff testified that he experiences debilitating back

pain approximately once or twice a year that is caused by prolonged stooping, bending, or lifting.

(Tr. 41-42).

Plaintiff testified that he is currently treating with Dr. John Linn in Memphis for his eye, who has performed his surgery, and Dr. Porter Smith in Poplar Bluff, who has been monitoring his eye following the surgery. (Tr. 42). Plaintiff stated that he has had four to five infections or other complications with his eye. (Id.). Plaintiff testified that he experiences pain and he must stay out of dusty or dirty areas when he gets infections. (Id.). Plaintiff stated that, when he gets ulcers, he cannot stoop, bend, or lift. (Id.). Plaintiff explained that it usually takes about ten days to treat an infection or ulcer. (Tr. 43). Plaintiff testified that his doctors have told him not to climb or operate any dangerous equipment due to his vision problems and that these restrictions have prevented him from engaging in his past work as a contractor. (Id.).

Plaintiff testified that he lives in Poplar Bluff with his wife and his stepson. (Id.). Plaintiff stated that on a typical day, his blood sugar levels are high when he wakes in the morning and he does not feel well for an hour or two. (Tr. 43-44). Plaintiff testified that he takes his medication and within an hour to two hours he gets out and does whatever chores he can, including pulling weeds out of the garden and mowing the yard while wearing a shield over his face. (Tr. 44). Plaintiff explained that since the eye injury, he must be careful not to run into things because of his loss of depth perception. (Id.). Plaintiff testified that on one occasion he operated a backhoe on his farm and ran the backhoe into a pond, due to his lack of depth perception. (Id.). Plaintiff stated that he no longer operates the backhoe. (Tr. 45).

Plaintiff testified that he tries to work on his cars, although it has become difficult to use hand tools because of his lack of depth perception. (Id.). Plaintiff stated that it takes approximately ten times longer to work on projects. (Tr. 46). Plaintiff testified that he used to be an avid hunter but he has significantly limited his hunting since the eye injury. (Id.). Plaintiff

stated that he had a rifle modified so that he could hunt. Plaintiff testified that he currently rabbit hunts without a gun, listening to his dogs instead. (Id.). Plaintiff further testified that walking on uneven terrain is difficult and he must wear eye protection. (Id.). Plaintiff stated that he recently went turkey hunting with his stepson and he found the walking to be very difficult. (Id.).

Plaintiff testified that he also experiences difficulty driving, especially on four-lane highways, due to his lack of peripheral vision. (Tr. 47). Plaintiff stated that he drives around his farm and he drives in Poplar Bluff sometimes. (Id.). Plaintiff testified that he tries to stay out of high traffic areas. (Id.). Plaintiff testified that one of his former jobs involved car sales. (Id.). Plaintiff stated that he could no longer work as a car salesman, due to his current appearance and because he could not move cars or engage in extensive reading and writing. (Tr. 48).

The ALJ then examined plaintiff, who testified that his wife is not employed. (Id.). Plaintiff explained that his wife quit her job a few months after plaintiff was injured so that she could care for plaintiff. (Id.). Plaintiff testified that he filed a Workers' Compensation claim, which has not been settled. (Tr. 48-49). Plaintiff stated that he was a part owner of Deaton Auto, which was a three-way partnership, but that he sold his share of the partnership because the partners could not get along. (Tr. 49). Plaintiff testified that he worked for Deaton Auto as a salesman before he became an owner of the entity. (Id.). Plaintiff stated that he is not working at all at the present time. (Tr. 50). Plaintiff testified that he performed odd jobs from 1997 to 2001, including work as an owner of a print shop. (Id.). Plaintiff explained that he gave this business to his former wife upon their divorce. (Id.).

Plaintiff testified that he lives on a three-and-a-half-acre parcel of a family farm that his mother gave to him after his divorce. (Id.). Plaintiff stated that he drives vehicles on the

property.  (Id.).  Plaintiff testified that there are no crops or livestock on the farm.  (Tr. 51).

Plaintiff stated that he owns pets, including four beagles, which he plans to take rabbit hunting.

(Id.).  Plaintiff testified that he does housework, including vacuuming, dusting, and taking out the

trash.  (Id.).  Plaintiff stated that he does not sweep, wash clothes, or shop for groceries.  (Id.).

Plaintiff testified that he does not take part in any church or other organized group activities.  (Tr.

52).

Plaintiff testified that he is on a diabetic diet that involves limiting carbohydrates and

eating balanced meals but that does not require counting calories.  (Id.).  Plaintiff stated that he

has not taken any vacations in the last few years.  (Tr. 53).  Plaintiff testified that his doctors have

not recommended that he do any specific exercises on a daily basis, although they have

recommended that he walk and do as much activity as he can in conjunction with his diet.  (Id.).

Plaintiff stated that he walks around the farm a few times a week for half a mile to a mile.  (Tr.

53-54).  Plaintiff testified that he has not seen a psychiatrist or a psychologist.  (Tr. 54).


B.      **Relevant Medical Records**

Plaintiff presented to A.D. Brookreson, M.D., on July 18, 1994, complaining of back pain

radiating into his left leg.  (Tr. 279).  Plaintiff underwent a lumbar[2] spine CT scan[3] on July 20,

_____

[2]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum.  See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[3]Abbreviation for computed tomography, which is the imaging of anatomic information from a cross-sectional plane of the body, each image generated by a computer synthesis of x-ray transmission data obtained in many different directions in a given plane.  Stedman's, at 1842.

1994, which revealed a herniated nucleus pulposus[4] at L5-S1.[5]  (Tr. 275).

The record reveals that plaintiff regularly saw L.J. Plunkett, Jr., M.D. for treatment of his diabetes.  (Tr. 255-65).  On March 13, 2001, Dr. Plunkett noted that plaintiff said he was "doing alright."  (Tr. 259).  Dr. Plunkett indicated that plaintiff was a "diabetic smoker," who smoked two packs of cigarettes a day.  (Id.).  Dr. Plunkett found no abnormalities, including no musculoskeletal abnormalities.  (Id.).  Dr. Plunkett indicated that plaintiff's diabetes was slowly getting under control.  (Id.).  On June 15, 2001, plaintiff complained of a tingling feeling in his arms, hands, legs, and feet, along with a lack of energy.  (Tr. 258).  At this time, Dr. Plunkett found musculoskeletal abnormalities.  (Id.).  On plaintiff's June 29, 2001 visit, plaintiff indicated that he was tired and lacked energy.  (Tr. 257).

On February 8, 2002, plaintiff presented to the emergency room at Three Rivers Healthcare, for treatment of an eye injury.  (Tr. 270).  Plaintiff stated that his right eye was struck with a wrench when he was working on a garage door spring at work.  (Id.).  Plaintiff underwent x-rays, which revealed some soft tissue swelling over the right cheek area, but no fracture.  (Tr. 268).  Peter Paulus, M.D., an eye specialist, diagnosed plaintiff with a ruptured globe[6] and assessed an "extremely guarded prognosis."  (Tr. 247).  On March 13, 2002, Dr. Plunkett saw plaintiff, and noted that plaintiff's blood sugars had been up since his eye injury.  (Tr. 256).  Dr. Plunkett again noted plaintiff's smoking habits.  (Id.).

_____

[4]Nucleus pulposus is the soft fibrocartilage central portion of the intervertebral disk. Stedman's, at 1240.

[5]Abbreviation for lumbar vertebrae (L1 to L5).  Stedman's, at 956.

[6]A tear or break of the eyeball.  See Stedman's, at 637, 1584.

In a note dated March 26, 2002, R. Porter Smith, M.D., another eye specialist, indicated that plaintiff underwent major surgery in February in Memphis. (Tr. 242). Dr. Smith noted that plaintiff would experience a "very slow healing process." (Id.). Plaintiff continued to see Dr. Paulus and Dr. Smith following his eye surgery, and until the time of his administrative hearing. (Tr. 246, 244, 234, 240, 232, 230, 178-204, 208). In an April 26, 2002 letter, Dr. Paulus indicated that plaintiff had a total retinal detachment,[7] and that the prognosis for improvement of vision is "practically nill." (Tr. 234).

Plaintiff continued to see Dr. Plunkett for the treatment of his diabetes. (Tr. 153-73). On May 1, 2002, Dr. Plunkett reported that plaintiff's eye injury was making plaintiff somewhat depressed. (Tr. 255). Dr. Plunkett continued to note plaintiff's smoking. (Id.). Plaintiff's blood sugar levels fluctuated. (Id.). Dr. Plunkett noted that plaintiff was depressed on a September 17, 2002 visit, and on an October 15, 2002 visit. (Tr. 172, 170). On July 24, 2003, Dr. Plunkett diagnosed plaintiff with diabetic neuropathy.[8] (Tr. 149).

On July 9, 2002, Dr. Smith diagnosed plaintiff with chronic retinal detachment and early ptosis.[9] (Tr. 230). Dr. Smith assessed plaintiff's prognosis as "very guarded for any visual function to return." (Tr. 229). Dr. Smith recommended that plaintiff avoid jobs requiring

---

[7]Loss of apposition between the sensory retinal and the retinal pigment epithelium. Stedman's, at 485.

[8]This most common of the chronic complications of diabetes can affect either the peripheral or the autonomic nervous system, or both. Symptoms include increased sensitivity to stimulation, diminished sensitivity to stimulation, loss of temperature, diarrhea, and constipation. Stedman's, at 1212.

[9]The sinking down or prolapse of the eye. See Stedman's, at 1481.

binocular vision[10] or depth perception and that plaintiff should work in a clean environment.  (Id.).

On October 8, 2002, plaintiff complained of stabbing pains occurring two to three times a day, and of irritation from his eye prosthesis.  (Tr. 202).  Dr. Smith found a corneal ulcer.[11]  (Id.).  Dr. Smith indicated in a July 23, 2003 letter that plaintiff underwent surgery to remove the ulcer.  (Tr. 143).  Dr. Smith stated that, since the surgery, plaintiff had experienced discomfort and lack of movement with his prosthesis.  (Id.).  Dr. Smith also recommended that plaintiff be refitted with a new prosthesis.  (Id.).

On October 29, 2002, Dr. Plunkett completed a "Residual Functional Capacity Questionnaire."  (Tr. 219-224).  Dr. Plunkett's diagnosis was blind right eye, diabetes mellitus,[12] hyperlipidemia,[13] depression, and history of back pain.  (Tr. 219).  He described plaintiff's prognosis as guarded.  (Id.).  Dr. Plunkett identified plaintiff's symptoms as fatigue and general malaise.  (Id.).  He noted that plaintiff's diabetes is poorly controlled.  (Tr. 220).  Dr. Plunkett stated that plaintiff often experiences these symptoms severely enough to interfere with attention and concentration.  (Id.).  Dr. Plunkett indicated that plaintiff suffers from a marked limitation in the ability to deal with work stress.  (Id.).  Dr. Plunkett stated that plaintiff could sit continuously for four hours, stand for two hours, walk for four to six hours, and lift or carry twenty pounds.

---

[10]Use of both eyes simultaneously.  Stedman's, at 1974.

[11]A lesion on the cornea resulting from loss of tissue, usually with inflammation.  See Stedman's, at 1903.

[12]A chronic metabolic disorder in which utilization of carbohydrate is impaired and that of lipid and protein enhanced; it is caused by an absolute or relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, water and electrolyte loss, and coma.  See Stedman's, at 490.

[13]The presence of an abnormally high concentration of lipids in the circulating blood.  Stedman's, at 1019.

(Tr. 221). Dr. Plunkett found that plaintiff cannot tolerate exposure to unprotected heights, work around moving machinery, operate machinery or use instruments with sharp edges, or perform work requiring fine visual acuity. (Tr. 223). Dr. Plunkett stated that plaintiff can occasionally drive automotive equipment, perform work requiring prolonged distance vision or continuous near vision, and perform work requiring prolonged exposure to bright lighting or changes in overhead lighting. (Id.). Dr. Plunkett noted that plaintiff requires frequent unscheduled breaks during an eight-hour working day in order to gain relief from his symptoms. (Tr. 222). With regard to plaintiff's vision, Dr. Plunkett found that plaintiff has limited depth perception, poor distance vision, "ghosting" of vision from headlights, "ghosting" of vision with prolonged focus on objects, and poor night vision. (Tr. 224). Finally, Dr. Plunkett indicated that plaintiff was likely to be absent from work due to his impairments approximately three times a month. (Tr. 223).

On January 31, 2003, Dr. Smith completed a "Physician's Statement." (Tr. 213-217). Dr. Smith stated that plaintiff will never have any useful vision in his right eye and that he has a constricted visual field in his left eye, which is being evaluated. (Tr. 214). Dr. Smith indicated that plaintiff cannot be exposed to unprotected heights, work around moving machinery, operate machinery, drive automotive equipment, or perform work requiring prolonged fixed vision or fine visual acuity. (Tr. 215). Dr. Smith stated that plaintiff could occasionally perform work requiring prolonged distance vision, continuous near-vision, prolonged exposure to sunlight, prolonged exposure to bright lighting, and exposure to rapid changes in overhead lighting. (Id.). Dr. Smith stated that plaintiff is not restricted in his ability to lift or bend. (Tr. 216). Regarding plaintiff's vision, Dr. Smith indicated that plaintiff has limited depth perception, blurred vision with

prolonged reading, poor distance vision, "ghosting" of vison from headlights, "ghosting" of vision with prolonged focus on objects, poor night vision, and blurriness of vision with wet or humid conditions. (Tr. 217).

Plaintiff was seen by Dr. Plunkett on February 24, 2003, following an emergency visit for pain below the ribcage. (Tr. 157). Dr. Plunkett diagnosed plaintiff with pancreatitis[14] and diabetes mellitus. (Id.). He recommended that plaintiff watch his diet and increase fluids. (Id.).

In a March 7, 2003 letter, John Linn, M.D. stated that he saw plaintiff on October 22, 2002, for treatment of his right eye. (Tr. 209). Dr. Linn indicated that plaintiff's visual acuity measured hand motion in the right eye and 20/30 in the left eye. (Id.). Dr. Linn noted that he would consider doing a Gunderson flap[15] in the right eye if the infection reoccurs. (Id.). Dr. Linn stated that plaintiff returned on November 12, 2002, at which time plaintiff elected to proceed with a Gunderson flap. (Id.). Dr. Linn reported that the procedure was successful and that plaintiff was found to be in stable condition on his postoperative visit on December 19, 2002. (Id.).

In a letter dated March 18, 2003, Dr. Linn states that he saw plaintiff on this day and his visual acuity measured hand motion in the right eye and 20/20 in the left eye. (Tr. 207). His right eye was found to be in stable condition, well-covered and well-vascularized. (Id.). Dr. Linn informed plaintiff that he could proceed with having a new prosthesis made for his right eye. (Id.). On June 18, 2003, plaintiff complained of pain in his right eye due to a fall. (Tr. 179). On June 24, 2003, plaintiff complained of fuzziness in his left eye. (Tr. 178). Dr. Smith noted that

---

[14]Inflammation of the pancreas. Stedman's, at 1302.

[15]A procedure similar to a skin graft, by which tissue from the eyeball is used for transplantation. See Stedman's, at 683.

the visual acuity in the left eye was now 20/40.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Social Security Act on February 8, 2002, the date the claimant stated he became unable to work, and continued to meet them through December 2002.

2.  The claimant has not engaged in substantial gainful activity since February 8, 2002.

3.  The medical evidence establishes that the claimant has right eye loss, diabetes mellitus, and back strain, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's allegations of disabling symptoms precluding all substantial gainful activity are not consistent with the evidence and are not credible for the reasons specified in the body of the decision.

5.  The claimant has the residual functional capacity to perform work except for work that involves frequently lifting over ten pounds or occasionally lifting over twenty pounds.  The claimant cannot engage in tasks requiring good bilateral vision.  He has 20/30 visual acuity in his left eye and retains sufficient vision to avoid workplace hazards and work with rather large objects.  There are no other exertional or nonexertional limitations (20 CFR 404.1545).

6.  The claimant is unable to perform his past relevant work as a contractor.

7.  The claimant has the residual functional capacity to perform a wide range of light work (20 CFR 404.1567).

8.  The claimant is 54 years old, which is defined as closely approaching advanced age (20 CFR 404.1563).

9.  The claimant has completed 12 years of education (20 CFR 404.1564).

10. Considering the claimant's residual functional capacity and vocational factors, the issue of whether the claimant has transferable skills is not critical (20 CFR 404.1568).

11. The claimant's failure to comply with medical directives is inconsistent with allegations of disability.

12. Based on Social Security Rulings 85-15 and 96-9p and the framework of Rule 202.20, Table No. 2 of Appendix 2, Subpart P, Regulations No. 4 and considering the claimant's residual functional capacity, age, education, and work experience, he is not disabled.

13. The claimant is not under a disability, as defined in the Social Security Act and Regulations (20 CFR 404.1520(f)).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on April 5, 2002, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(I) and 223, respectively, of the Social Security Act.

(Tr. 28-29).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). It is not the court's task "to review the evidence and make an independent decision." See Mapes, 82 F.3d at 262. If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See id. The reviewing court, however, must consider both evidence that supports and evidence that detracts from the

Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520©, 416.920©.  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404.20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

C.    **Plaintiff's Claims on Appeal**

Plaintiff raises two claims on appeal of the Commissioner's decision. Plaintiff first argues that the ALJ's determination of plaintiff's residual functional capacity was improper, in that the

ALJ failed to consider the opinions of plaintiff's treating physicians regarding plaintiff's

impairments. Plaintiff also argues that the ALJ erroneously applied the Medical-Vocational

Guidelines instead of obtaining vocational expert testimony because the evidence establishes

significant nonexertional impairments.

### 1.     Residual Functional Capacity

Plaintiff first argues that the ALJ did not properly weigh the medical evidence. Plaintiff

specifically asserts that the ALJ failed to consider the opinions of plaintiff's treating physicians as

to the nature and severity of plaintiff's impairments. The undersigned finds this argument

persuasive and finds that the ALJ's discounting of the reports of Dr. Smith and Dr. Plunkett was

error. The undersigned also believes that discounting these reports has caused the ALJ to

formulate a residual functional capacity for plaintiff that is not supported by substantial evidence.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the

various treating and examining physicians'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir.

2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating

physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108,

1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). This is to be

contrasted with the axiom that "[the opinion of a consulting physician who examines claimant

once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d

448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589). Further, a treating physician's

opinion will typically be given controlling weight when the opinion is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir.

2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). However, such

opinions do "not automatically control, since the record must be evaluated as a whole." Id. at

1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted

or disregarded where other "medical assessments 'are supported by better or more thorough

medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). An ALJ

is free to reject the conclusions of any medical source if those findings are inconsistent with the

record as a whole. See Johnson, 240 F.3d at 1148.

Whatever weight the ALJ accords the treating physician's report, be it substantial or little,

the ALJ is required to give good reasons for the particular weight given the report. See

Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). However, an ALJ is not required to

discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir.

1998). If the opinion of a treating physician is not well supported or is inconsistent with other

evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of

examination, (2) the nature and extent of the treatment relationship, including the treatment

provided and the kind of examination or testing performed, (3) the degree to which the

physician's opinion is supported by the relevant evidence, (4) consistency between the opinion

and the record as a whole, (5) whether or not the physician is a specialist in the area upon which

an opinion is rendered, and (6) other factors which may contradict or support the opinion. See

Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6)(2002).

In the instant case, the ALJ did not accord the proper weight to the statements of Drs.

Smith and Plunkett, nor did he sufficiently articulate the reasons given for discounting these

opinions. In his opinion, the ALJ did not even acknowledge the "Residual Functional Capacity

Questionnaire" that Dr. Plunkett completed on October 29, 2002. (Tr. 219-24). In this document, Dr. Plunkett indicated that plaintiff could sit continuously for four hours, stand for two hours, walk for four to six hours, and lift or carry twenty pounds. (Tr. 221). Dr. Plunkett also found that plaintiff cannot tolerate exposure to unprotected heights, work around moving machinery, operate machinery or use instruments with sharp edges, or perform work requiring fine visual acuity. (Tr. 223). Dr. Plunkett stated that plaintiff could only occasionally drive automotive equipment, perform work requiring prolonged distance vision or continuous near vision, and perform work requiring prolonged exposure to bright lighting or changes in overhead lighting. (Id.). In addition, Dr. Plunkett expressed the opinion that plaintiff requires frequent unscheduled breaks during an eight-hour working day in order to gain relief from his symptoms. (Tr. 222). Regarding plaintiff's vision, Dr. Plunkett found that plaintiff has limited depth perception, poor distance vison, "ghosting" of vision from headlights, "ghosting" of vision with prolonged focus on objects, and poor night vision. (Tr. 224). The ALJ nowhere discusses Dr. Plunkett's residual functional capacity assessment, nor did he explain his rationale for declining to consider and discounting this treating source, as he is required to do. See Holmstrom, 270 F.3d at 720.

Dr. Smith, plaintiff's treating eye specialist, completed a "Physician's Statement" on January 31, 2003. (Tr. 213-217). In this statement, Dr. Smith expressed the opinion that plaintiff will never have any useful vision in his right eye and that he has a constricted visual field in his left eye, which is being evaluated. (Tr. 214). Dr. Smith determined that plaintiff cannot be exposed to unprotected heights, work around moving machinery, operate machinery, drive automotive equipment, or perform work requiring prolonged fixed vision or fine visual acuity. (Tr. 215). Dr.

Smith also found that plaintiff could only occasionally perform work requiring prolonged distance vision, continuous near-vision, prolonged exposure to sunlight, prolonged exposure to bright lighting, and exposure to rapid changes in overhead lighting. (Id.). Dr. Smith revealed the same findings as Dr. Plunkett regarding plaintiff's vision. (Tr. 217). The ALJ referred to Dr. Smith's report, yet did not acknowledge any of Dr. Smith's findings regarding plaintiff's functional limitations. The ALJ only referred to an isolated comment of Dr. Smith noting that plaintiff had very recently undergone a procedure on his right eye that might temporarily cause bilateral tearing or blurred vision. (Tr. 24). The ALJ also pointed out that Dr. Smith indicated that plaintiff's vision problems did not affect his ability to perform work-related lifting or bending. (Id.).

After discussing the medical evidence, the ALJ concluded:

> [t]here is no medical evidence that any treating, examining, or reviewing physician has ever found or imposed any long term, significant, and adverse mental or physical limitations on the claimant's functional capacity. There is no medical evidence that the claimant has required extensive surgery or prolonged hospitalization. These factors are clearly inconsistent with disability.

(Tr. 26). The ALJ then pointed to a number of factors that detracted from plaintiff's credibility. The ALJ found that plaintiff's daily activities are more than minimal, plaintiff does not take pain medication, plaintiff's diabetes can be controlled with medication, plaintiff does not seek regular treatment for his back pain, plaintiff has a history of relatively low earnings, and plaintiff continues to smoke cigarettes. The ALJ then made the following assessment regarding plaintiff's residual functional capacity:

> [n]othing stated in this decision is meant to suggest or imply that the claimant does not have genuine medical problems with some functional limitations. However, based upon the totality of the evidence and giving the claimant the benefit of the doubt as to the severity of his impairments, the Administrative Law Judge finds that the claimant has the residual functional capacity to perform work except for work that involves frequently lifting over ten pounds or occasionally lifting over twenty pounds. The claimant cannot

engage in tasks requiring good bilateral vision. He has 20/30 visual acuity in his left eye and retains sufficient vision to avoid workplace hazards and work with rather large objects. The medical evidence does not establish the existence of any other persistent, significant, and adverse limitation of function due to any other ailment. This residual functional capacity is supported by the collective medical records of Doctors Plunkett, Sullivan, Linn, Smith, Paulus, and Pinderski.

(Tr. 27).

By ignoring the assessments of Drs. Plunkett and Smith as to plaintiff's functional limitations, the ALJ has produced a residual functional capacity not supported by substantial evidence. Residual functional capacity is what a claimant is able to do despite any limitations caused by a claimant's impairments. See McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003). Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 711-712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogemeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer**,** 245 F.3d at 703.

As noted above, the ALJ discounted the opinions of the treating physicians, and instead based his residual functional capacity assessment solely on the purported credibility of plaintiff. The ALJ's finding that plaintiff can lift ten pounds frequently and twenty

pounds occasionally is consistent with Dr. Plunkett's assessment that plaintiff can lift a maximum of twenty pounds. The ALJ's finding is actually more restrictive than Dr. Smith's assessment that plaintiff is not restricted in the amount of weight he can lift. The ALJ's finding with respect to plaintiff's vision limitations, however, is simply that plaintiff "cannot engage in tasks requiring good bilateral vision." (Tr. 27). The ALJ further notes that plaintiff "has 20/30 visual acuity in his left eye and retains sufficient vision to avoid workplace hazards and work with rather large objects." (Id.).

The ALJ fails to mention plaintiff's significant visual limitations as found by plaintiff's treating physicians, including plaintiff's limited depth perception, blurred vision with prolonged reading, poor distance vision, "ghosting" of vision from headlights, "ghosting" of vision with prolonged focus on objects, poor night vision, and blurriness of vision with wet or humid conditions. The ALJ also ignored the environmental limitations found by plaintiff's treating physicians, including plaintiff's inability to tolerate exposure to unprotected heights, work around moving machinery, operate machinery or use instruments with sharp edges, or perform work requiring fine visual acuity. Instead, the ALJ arbitrarily derived a residual functional capacity that is vague and does not include the many nonexertional limitations as found by plaintiff's treating physicians.

The undersigned recognizes that the ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996). It is well-established that in disability determinations, credibility assessments are left to the ALJ and not the courts. This court cannot "disturb the decision of an ALJ who seriously considers, but or good reasons explicitly discredits, a claimant's testimony of

disabling pain." <u>Browning v. Sullivan</u>, 958 F.2d 817, 822 (8th Cir. 1992). It is quite a different case when, in formulating the residual functional capacity, the opinions of two treating physicians are ignored even when the objective medical record fully supports them, due to plaintiff's alleged lack of credibility. In such a case, it cannot be then said that the ALJ's residual functional capacity is based on substantial evidence.

In this case, all of the objective medical evidence in the record, including the opinions of treating sources Dr. Plunkett and Dr. Smith, is indicative of much greater restriction due to plaintiff's visual impairments than the residual functional capacity formulated by the ALJ. The opinion of Dr. Smith, who is plaintiff's treating eye specialist, should carry significant weight as to plaintiff's functional restrictions caused by his visual impairments. Yet the ALJ does not even acknowledge these restrictions, nor does he set out any inconsistencies between these opinions and the record.

Further, plaintiff's testimony regarding his impairments is consistent with the findings of his treating physicians. At his administrative hearing, plaintiff repeatedly testified as to his loss of depth perception and loss of peripheral vision. Plaintiff testified that he has no vision at all in his injured right eye and that he experiences periodic visual impairment in his left eye, which is consistent with the diagnoses of his treating physicians. (Tr. 36). Plaintiff stated that he is unable to engage in activities such as threading a fishhook, or using small hand tools, due to his loss of depth perception. (Tr. 37, 45-46). Plaintiff further testified that his loss of depth perception has impaired his ability to drive, and has caused him to have automobile accidents. (Tr. 37-38). Plaintiff stated that his loss of depth perception has affected his ability to walk, especially on uneven terrain. (Tr. 38). Plaintiff complained of pain in his eye that is aggravated and prone to

infection when he is in dusty or dirty areas.  (Tr. 42).  Plaintiff also stated that he is unable to operate any dangerous equipment due to his visual impairments.  (Tr. 43).  Plaintiff further testified that, on one occasion when he tried to operate farm machinery, he ran the equipment into a pond due to his lack of depth perception.  (Tr. 44).

Plaintiff's testimony regarding his daily activities also does not conflict with the opinions of his treating physicians.  Plaintiff testified that he regularly pulls weeds from his garden, and mows his yard while wearing a protective shield over his face.  (Tr. 44).  Plaintiff stated that, although he had a rifle modified so that he could hunt, he rabbit hunts without a gun because he is unable to shoot a gun.  (Tr. 46).  Plaintiff testified that the last time he went hunting, he found it very difficult due to the amount of walking on uneven terrain that is required.  (Id.).  Plaintiff stated that he drives vehicles on his farm and occasionally in town, but that he stays out of high-traffic areas.  (Tr. 47).  Plaintiff testified that the only housework he performs is vacuuming, dusting, and taking out the trash.  (Tr. 51).  Although plaintiff engages in some activities on a regular basis, none of them are inconsistent with the visual limitations found by his treating physicians.

For all the foregoing reasons, the undersigned finds that the ALJ improperly discounted the medical opinions of Drs. Plunkett and Smith, and formulated a residual functional capacity not based on the medical evidence in the record.  Accordingly, the undersigned recommends that this matter be reversed and remanded back to the Commissioner in order for the ALJ to accord the proper weight to the medical statements of Drs. Plunkett and Smith, and to formulate plaintiff's residual functional capacity therefrom.

### 2.     Medical Vocational Guidelines

Plaintiff also argues that the ALJ erroneously applied the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because the evidence establishes significant nonexertional impairments. Specifically, plaintiff claims that the ALJ erred in determining that plaintiff can perform a wide range of light work

The ALJ found that plaintiff has the following impairments: right eye loss, diabetes mellitus, and back strain, which are severe, but do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 24). The ALJ further found that plaintiff had the residual functional capacity to perform work except for work that involves frequently lifting over ten pounds or occasionally lifting over twenty pounds, and that plaintiff cannot engage in tasks requiring good bilateral vision (Tr. 27). Additionally, the ALJ found that plaintiff has 20/30 visual acuity in his left eye and retains sufficient vision to avoid workplace hazards and work with rather large objects. (Id.). The ALJ found that plaintiff cannot perform his past relevant work as a contractor. (Id.). Then, relying on the Vocational-Medical Guidelines, the ALJ made the following findings:

> [i]n summary, after reviewing the entire record, including the clinical and objective findings and the claimant's testimony, the Administrative Law Judge finds that the claimant is able to perform a wide range of work at the light exertional level. Social Security Ruling 85-15 (as modified by Social Security Ruling 96-9p) indicates that, as long as the claimant retains sufficient visual acuity to be able to handle and work with rather large objects and avoid workplace hazards, a substantial number of jobs remain at the light exertional level. Considering the claimant's age, education and work experience and a capacity for a wide range of light work and based on Social Security Rulings 85-15 and 96-9p and the framework of Medical-Vocational Rule 202.20, Table 2, Appendix 2, Subpart P, Regulations No. 4, the claimant is not disabled. The Medical-Vocational Rules are binding on the Administrative Law Judge. The claimant is not under a disability, as defined in the Social Security Act and Regulations.

(Id.).

As set forth above, once a claimant establishes that he or she is unable to return to past

relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. The Commissioner may rely on the Medical-Vocational Guidelines to show the availability of work in certain limited circumstances. See Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). "If an applicant's impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Id. (quoting Beckley, 152 F.3d at 1059). However, when a claimant is limited by nonexertional impairments or when a claimant's relevant characteristics differ from the Guidelines, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability. See id.; Wiley v. Apfel, 171 F.3d 1190, 1191 (8th Cir. 1999); Foreman v. Callahan, 122 F.3d 24, 25-26 (8th Cir. 1997); Mackinaw v. Bowen, 866 F.2d 1023, 1024 (8th Cir. 1989).

The Eighth Circuit Court of Appeals has recognized that diminished vision is a nonexertional impairment, precluding reliance on the Guidelines. See Doolittle v. Apfel, 249 F.3d 810, 811 (8th Cir. 2001)(remanding claim of claimant who suffered from loss of vision in his left eye because the ALJ failed to call a vocational expert to determine whether claimant's nonexertional impairment prevented him from performing jobs in the national economy); Nesselrotte v. Sullivan, 939 F.2d 596, 598 (8th Cir. 1991)("[t]he presence of a 'marked' visual impairment would preclude reliance on the guidelines.").

The undersigned finds that the ALJ committed error by not eliciting the testimony of a

vocational expert. The ALJ determined that plaintiff's nonexertional impairment was severe. (Tr. 24). It is indisputable that plaintiff lacks all vision in his right eye and has limited vision in his left eye. The ALJ's finding that plaintiff was able to perform light work in spite of his nonexertional impairment thus "invaded the province of the vocational expert" and was improper. Foreman, 122 F.3d at 26 (quoting Sanders v. Sullivan, 983 F.2d 822, 824 (8th Cir. 1992)). The ALJ noted in his written opinion that, under Social Security Ruling 85-15, as long as the claimant retains sufficient visual acuity to be able to handle and work with rather large objects and avoid workplace hazards, a substantial number of jobs remain at the light exertional level. Yet the ALJ cites no medical evidence in support of his determination that plaintiff can, in fact, work with large objects and avoid workplace hazards. In fact, this determination conflicts with the opinions of Drs. Smith and Plunkett, who both found that plaintiff cannot be exposed to unprotected heights, work around moving machinery, or operate machinery, among other functional limitations, due to his impaired vision. The Eighth Circuit Court of Appeals in Talbott v. Bowen, 821 F.2d 511 (8th Cir. 1987), stated:

> where a claimant suffers from a nonexertional impairment . . . alone or in combination with exertional impairments, that significantly limits his ability to perform the *full* range of work contemplated by the Medical-Vocational Guidelines, the ALJ may not rely on the guidelines to satisfy the Secretary's burden of proof, but must instead produce expert vocational testimony.

821 F.2d at 515 (citations omitted)(emphasis in original).

As discussed above, the ALJ formulated a residual functional capacity that was not supported by substantial evidence. Based on this erroneous residual functional capacity, he then applied the Medical-Vocational Guidelines and determined that plaintiff could perform a wide range of light work. As a result, the undersigned recommends that the decision of the

Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to reassess plaintiff's residual functional capacity and to adduce the testimony of a vocational expert to determine how plaintiff's nonexertional impairments restrict his ability to perform jobs in the national economy.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that, pursuant to sentence four of 42 U.S.C. § 605 (g), the decision of the Commissioner be **reversed** and this case be **remanded** to the Commissioner for further proceedings consistent with this Report and Recommendation and further that the court not retain jurisdiction of this matter.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this   5th   day of August, 2005.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE